**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANTS:

**R. PATRICK MAGRATH**
Alcorn Goering & Sage, LLP
Madison, Indiana

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

**AMANDA TEBBE CANESSA**
Indiana Department of Child Services
Lawrenceburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF S.B.: | ) ) ) ) |
| U.D. and L.B., | ) ) |
| Appellants-Respondents, | ) ) |
| vs. | )  No. 15A05-1209-JT-457 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1204-JT-10

**April 8, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

U.D. ("Father") and L.B. ("Mother") (collectively "Parents") appeal the trial court's termination of their parental rights over their minor child S.B. ("the child"). Parents raise the following dispositive issues for our review:

1.  Whether the trial court's conclusion that continuation of the parent-child relationships poses a threat to S.B. is clearly erroneous; and

2.  Whether the trial court's conclusion that termination of Parents' parental rights over S.B. is in the child's best interests is clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

When Mother became pregnant with S.B., she and Father were unmarried, but living together. Following an incident of domestic violence resulting in injuries to Mother, Mother and Father ceased living together. Mother gave birth to S.B. on March 20, 2007. Father did not establish paternity of S.B. after his birth.

On August 20, 2010, DCS filed a petition alleging that S.B. was a child in need of services ("CHINS") due to Mother's substance abuse and her alleged physical abuse of S.B. The petition listed S.B.'s father as "unknown." Appellants' App. at 14. S.B. became a ward of DCS and was placed in foster care.

Ultimately, DCS filed petitions to terminate Parents' parental rights to S.B. Following a hearing on those petitions, the trial court issued the following findings setting out the remaining facts and procedural history of this case:

3.  The father, [U.D.], was aware of the pregnancy and birth of the child, [S.B.], but did not pursue establishing paternity of the child prior to DCS involvement with the family. He did contact [Mother] when he heard

2

through mutual friends that [S.B.] had been removed from [Mother's] home by DCS.

4. The father, [U.D.], had married another woman the following year after [S.B.]'s birth, and that relationship ended due to domestic violence in the home.

5. The father, [U.D.], admitted he had a drug problem over the years resulting in numerous criminal convictions and times of incarceration. While in prison, father completed numerous programs and obtained a G.E.D. in an attempt to improve his life; however, father frequently returned to similar behaviors once he was released from incarceration, despite attending programs while incarcerated.

6. August 20, 2010, the Court entered an EMERGENCY CUSTODY ORDER removing the child from the mother based upon a report that the mother, [L.B.], had bruises on her face, appeared to be under the influence resulting in slurred speech and half-closed eyes. The child, [S.B.], had poor hygiene and dirty clothing.

7. October 4, 2010, the Court found the child, [S.B.], to be a [CHINS] based upon mother's admission.

8. October 14, 2010 a Dispositional Hearing was held and the Court accepted the recommendations made by DCS. However, the written Dispositional Order was not filed until September 19, 2011.

9. The Court held review hearings on January 10, 2011; April 11, 2011; June 24, 2011; August 18, 2011; the orders from those hearings reflect that mother and father were often not compliant with DCS or with the child's case plan and had not enhanced their ability to fulfill their parenting obligations.

10. Mike Probst testified that as the family case manager he worked with both mother and father to create child and family team meetings (CFTM) for mother and father to work with DCS on the case plan for getting [S.B.] back in the home. Mike worked with the parents in explaining the process of a CFTM and inviting both the service providers working with them as well as their own support network of family or friends. Mike worked with the parents on finding dates and times that would work for the parents. Despite this, both [Father and Mother] did not come to the CFTM on multiple occasions.

11. Mike also testified that it is DCS policy to not provide services for an alleged father prior to confirmation that the alleged father is indeed the father. Once [Father] was found to be the father, Mike requested several assessments through service providers. [Father] did not complete those assessments.

12. Mother was ordered to attend dialect behavioral therapy (DBT); individual therapy and substance abuse therapy. Mother's attendance was sporadic to these ordered therapies. However, mother testified that she is now currently attending DBT.

3

13. That Probst further testified that at the time he left the case in August of 2011 that parents had made no progress toward reunification.

14. Darci Bayne, CMHC Systems of Care, testified that she worked with mother and father through services put in place by DCS to supervise visits for DCS. She testified that while mother and father were relatively appropriate during those supervised visitations, the parents missed several scheduled visits with [S.B.]

15. Becky Babst, CMHC Family Nurturing Center, testified that she was asked by DCS to work with mother as an in-home parent aide and was also available to provide transportation for mother. She testified that mother asked her to be taken off the case when she and mother had an argument over safety concerns and areas in the home that needed to be fixed. She testified that mother did not respond well to her suggestions about mother's home.

16. Father, [U.D.], and mother, [L.B.], moved in together in late January or early February 2011 in order to work together for the return of their child and [Father] confirmed that he was the father through DNA testing in May 2011.

17. Father, [U.D.], and mother, [L.B.]'s attempt at reconciliation lasted approximately seven (7) months. During that time, there were two incidents of domestic violence, one on June 25, 2011 when [Father] dragged [Mother] with his automobile. A second incident took place on August 21, 2011 when [Father] choked [Mother]. [Father] was incarcerated for four (4) months for the choking incident and once again completed programs in prison for self-improvement.

18. The child, [S.B.], suffers from Reactive Attachment Disorder (RAD), intermittent explosive disorder and post-traumatic stress disorder (PTSD) and possible diagnosis of Attention Deficit Hyperactive Disorder (ADHD).

19. Dr. [Gongwer] testified that [S.B.]'s PTSD is notable in that he becomes particularly anxious when someone is injured.

20. The child's behaviors have included punching a window; scratching his arms; hitting himself in the head; throwing fits; grunting at people and throwing shoes. Dr. [Gongwer] noted improvements in his behavior and condition over time.

21. The Court finds that improvements to child's behavior are due in significant part to the current treatment provided and the consistent home life provided by foster parents.

22. Due to [S.B.]'s RAD, Dr. [Gongwer] recommended that stability is the best thing for [S.B.] She noted that reunifying him with his parents at this point would cause a disruption that could be worked on but would take significant time and would be detrimental to [S.B.]

23. Due to [S.B.]'s diagnoses, he requires a high level of care. [S.B.] takes the medications Risperdal and Intuniv daily for controlling some of

his behaviors. Additionally, he attends therapy four times per week; music therapy one time per week and sees Dr. [Gongwer] every three to four weeks.

24. Dr. [Gongwer] testified that [S.B.] calls his penis "birdie" and discusses not liking it when someone hurts his birdie and not liking being hurt while someone plays with his butt. During this testimony, mother, [L.B.] was smiling and father, [U.D.], also had an inappropriate expression given the nature of the testimony. Father claimed that his expression was a worried expression as this was the first he'd heard of [S.B.] disclosing this. Mother claimed she was smiling because she had taught him to use the word "birdie" in reference to his penis.

25. [L.B.]'s stepfather testified that if [Mother] was reunified with [S.B.] that he would help her take care of [S.B.] but that he would not take care of [S.B.] himself. He noted that [Mother] had a rough past but he believed she was more stable now.

26. [Mother]'s boyfriend [R.M.] testified that they no longer have drugs in their home and he is currently living with [Mother].

27. For her own part, [Mother] testified that she has borderline personality disorder for which she is currently taking medication.

28. [Father]'s girlfriend [C.S.] testified that despite his past, [Father] has not committed domestic violence on her and that he is currently appropriate with her own children.

29. [Father]'s current employer testified that he and [Father] have been in numerous disagreements in their time working together but they are always able to work them out.

30. DCS' plan for [S.B.] is that he be adopted; this plan is satisfactory for Child's care and treatment.

31. The child is in the foster care of Mr. and Mrs. [A.S. and K.S.] and has been there for under one year. The child is very bonded with the foster parents and they are willing to adopt the child. They noted that they realize that [S.B.] will continue to need therapy and services even after the CHINS case is closed. They noted some improvement to [S.B.]'s behavior from when he first arrived in their home to now.

32. The GAL, Mark Scott, believes it is in [S.B.]'s best interest to remain with the foster parents. He testified that [S.B.] has gone through some significant losses in his life—he was removed from his mother and her boyfriend in August, 2010. [S.B.] was in a previous foster placement prior to moving in with [A.S. and K.S.] [S.B.] told the GAL that he was worried he would have to leave [A.S. and K.S.] soon too because "every time I wear shorts I have to leave."

Appellants' App. at 138-43. Following the hearing on the petitions to terminate Parents'

parental rights with respect to S.B., the trial court entered the following conclusions:

5

2.  There is a reasonable probability that:
A.   The conditions which resulted in Child's removal and continued placement outside the home will not be remedied as shown by:
> i.   mother and father's lack of participating in treatment with services provided by the DCS;
> ii.   father's treatment while incarcerated but father's inability to effectively change his behaviors;
> iii.   mother's inability to accept help and suggestion from service providers;
> iv.   mother and father's apparent inability to understand the grave issues their son has faced and will face due to the trauma he has survived as evidenced by their responses to the testimony of the child's psychiatrist.

B.   That continuation of the parent-child relationship poses a threat to Child's well-being as shown by:
> i.   [S.B.]'s significant medical and psychological diagnoses require a higher level of care than many other children;
> ii.   [S.B.] is at risk of further trauma ever time he moves from home to home
> iii.   [S.B.] has given voice to this fear through discussion with his GAL;
> iv.   Neither mother nor father seem to have a good understanding of the depth of their son's current issues or the past trauma he has survived.

3.  Termination of parental rights is in Child's best interests.
4.  There is a satisfactory plan for the care and treatment of Child, that being adoption.

Id. at 145-47.  Accordingly, the trial court ordered that Parents' parental rights to S.B. were terminated.  This appeal ensued.

**DISCUSSION AND DECISION**

**Standard of Review**

We begin our review by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution."  Bailey v. Tippecanoe Div. of Family & Children (In re

6

M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty. Office of Family & Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[1] That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. The DCS's "burden of proof in termination of parental rights cases is one of

---

[1] Indiana Code Section 31-35-2-4(b)(2)(B) also allows the DCS to allege that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services." But that additional, alternative provision is not relevant here.

'clear and convincing evidence.'" R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.), 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Peterson v. Marion Cnty. Office of Family & Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Judy S. v. Noble Cnty. Office of Family & Children (In re L.S.), 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). trans. denied.

Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

Parents challenge some of the trial court's findings of fact in its order terminating their parental rights. Parents also challenge the court's legal conclusions that, on these facts, termination of their parental rights is justified because a continuation of the parent-

8

child relationships poses a threat to the child's well-being[2] and that the termination of their parental rights is in the child's best interests. We address each argument in turn.

### Issue One: Whether Continuation of the Parent-Child Relationships Poses a Threat to the Child

We first consider Parents' assertion that continuation of the parent-child relationships does not pose a threat to the child. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.), 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. Id.

Again, in support of this conclusion, the trial court noted that: S.B. has "significant medical and psychological diagnoses requir[ing] a higher level of care than many other children"; "S.B. is at risk of further trauma every time he moves from home to home"; S.B. has expressed his fear of moving from home to home to the GAL; neither parent "seem[s] to have a good understanding of the depth of their son's current issues or the past trauma he has survived." Appellants' App. at 146.

Father first contends that

> [i]t is not clear why S.B.'s higher level of necessary care alone gives rise to
> a threat to S.B.'s mental well-being. It is presumed that the trial court is

---

[2] Parents also assert that DCS's evidence fails to show that Parents will not remedy the conditions that resulted in the child's removal, but we need not consider that argument given the disjunctive nature of Indiana Code Section 31-35-2-4(b)(2)(B) and our holding that the trial court's conclusion is justified under on subsection (b)(2)(B)(ii).

9

implying that Father would not be able to provide the necessary care for S.B. However, the record contains no evidence supporting this implication.

Father's Brief at 15. And Father asserts that he "has demonstrated his desire to be an active Father by becoming involved in the CHINS action and voluntarily participating in parenting programs. He is employed and has a home with a support network." Id.

But Father's contentions amount to a request that we reweigh the evidence, which we will not do. Father ignores the evidence that, after attending one family meeting with DCS case manager Probst in March 2011, Father failed to appear at three subsequent meetings, even though Father and Mother had set the dates and times of those meetings to accommodate their schedules. Then, on June 25, 2011, Father was arrested after he dragged Mother with his car, causing her injuries. And on August 22, Father was arrested after he choked Mother, and Father was incarcerated with a scheduled release date in December. Due to his criminal conduct on those occasions, Father's efforts in attending supervised visitation with S.B. were disrupted. Father has not demonstrated that he is capable of providing the care S.B. needs, including a stable home environment.

To the extent Father contends that DCS failed to offer him services, Father ignores the fact that he delayed establishing paternity of S.B. until May 2011. As we held in In re M.R., 934 N.E.2d 1253, 1255 (Ind. Ct. App. 2010), a juvenile court may not enter a parental participation decree against an alleged parent. DCS had no obligation to offer Father services toward reunification until he established paternity of S.B. Still, DCS invited Father to family meetings with service providers in an effort to "plan for the return" of S.B. to Parents' care. Transcript at 21. But Father failed to attend all but one of those meetings. And, after he established paternity, Father was arrested for domestic

10

violence against Mother twice, which disrupted any efforts he may have made toward reunification with S.B. As this court has observed, "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." In re A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992). Moreover, if a parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, "then the onus is on the parent to request additional assistance from the court or DCS." Prince v. Dep't of Child Servs., 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007).

In support of her contention on this issue, Mother directs us to evidence showing that she is able to provide the necessary care for S.B. given that she has: undergone treatment for her mental illness; has been drug-free since 2011; has a safe home for S.B.; and can provide transportation for S.B.'s therapy. In addition, Mother points out that S.B.'s problems with transitioning to new homes is due to incidents he experienced in foster care, not because of anything she has done.

But Mother's contentions on this issue also amount to a request that we reweigh the evidence. The evidence shows that Mother was non-compliant with the case plan for reunification. Mother missed five out of twelve Dialectical Behavior Therapy sessions between January 4, 2011 and March 22, 2011; and she missed nine out of fourteen substance abuse group meetings during approximately the same period of time. And, like Father, Mother missed three family meetings with the DCS case manager in 2011. Mother had a particularly hard time complying with home-based services. On one occasion when Babst attempted to conduct an in-home visit, Mother expressed anger

11

towards Babst upon her arrival at the home. Mother refused to listen to Babst and would not engage in conversation. Mother then requested a new case worker. Finally, Mother exhibited inappropriate behavior during supervised visits in that, despite the case worker's instructions, Mother lingered with S.B. at the end of visits until he became visibly upset.

Finally, both Father and Mother contend that the trial court mischaracterized their reactions to Dr. Gongwer's testimony regarding alleged molestation of S.B. that occurred during prior foster care. But the trial court listened to both parents' explanations for their apparent inappropriate reactions to the testimony, and the court rejected those explanations. The trial court is in the best position to assess Parents' demeanor in the court room, and we will not second-guess the court's determination on this issue.

Again, the trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. Shupperd, 762 N.E.2d at 1290. Given Father's repeated incidents of domestic violence against Mother, even during the CHINS proceedings, and his repeated failure to attend family meetings, Father cannot show that he will be able to provide adequate care or permanency for S.B. in the future. And given Mother's long history of substance abuse, the lack of certainty as to whether Mother's sobriety would be maintained, as well as Mother's failure to comply with multiple services ordered in the case plan, Mother cannot show that she will be able to provide adequate care or permanency for S.B. in the future.

12

Parents have not demonstrated that the trial court's conclusion that continuation of the parent-child relationships poses a threat to the child's well-being is clearly erroneous. Accordingly, we agree with the trial court that the termination of Parents' parental rights over S.B. was appropriate under Indiana Code Section 31-35-2-4(b)(2)(B)(ii).

### Issue Two: Whether Termination is in S.B.'s Best Interests

Parents also argue that the DCS failed to show that termination of the parent-child relationships is in the child's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. Stewart v. Ind. Dep't of Child Servs. (In re J.S.), 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). We have previously held that the recommendations of the case manager and CASA to terminate parental rights, in addition to evidence that the continuation of the parent-child relationship poses a threat to the child, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. M.M. v. Elkhart Office of Family & Children (In re M.M.), 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

Here, in addition to the evidence described above in Issue One, Mark Scott, the GAL, testified that

> given the length of time [S.B.]'s been out of the family . . . away from his mother, the length of time he's been with the [foster family], I really do believe that it would be really harmful to him to be moved again. I think he's bonded with them, they provide for him, they're very loving, they provide for every need, they do what needs to be done and will continue to do so, and I just think it would be very harmful for him to move again.

13

Transcript at 71. And Dr. Gongwer, S.B.'s psychiatrist, testified that it is in S.B.'s best interests "to remain in a stable environment," which she identified as being in the foster parents' home. Id. at 126. Accordingly, the trial court's conclusion that termination of Parents' parental rights over S.B. is in the child's best interests is not clearly erroneous. See id.

## Conclusion

In sum, the trial court's order terminating Parents' parental rights over S.B. is not clearly erroneous. The trial court concluded that continuing the parent-child relationships would pose a threat to S.B. and is not in S.B.'s best interests. In addition, the trial court concluded that DCS has a satisfactory plan for the care and treatment of S.B., namely, adoption. The court's conclusions are supported by its findings and its findings are supported by the evidence. Accordingly, we affirm the trial court's termination of Parents' parental rights over S.B.

Affirmed.

BAILEY, J., and BARNES, J., concur.